UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD SWEATT,<br><br>    Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>    Defendant. | No. 12 C 9579<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiff Ronald Sweatt, a fifty-seven year old African American, filed suit against Defendant Union Pacific Railroad Company ("Union Pacific"). Sweatt alleges violation of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*; age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; race discrimination in violation of the Civil Rights Act of 1991, as amended, 42 U.S.C. § 1981; and perceived and actual disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Before the Court is Union Pacific's motion for summary judgment [47]. Because the FELA claims are time-barred, Sweatt has not called into question Union Pacific's reason for not hiring him, and Sweatt has abandoned his ADA claims, Union Pacific's motion for summary judgment is granted.

## BACKGROUND[1]

### I. Sweatt's History with Union Pacific

Sweatt began working at Union Pacific in 2006 as a laborer in the Maintenance of Way Department. As a laborer, Sweatt operated a spike maul and performed other duties to maintain

---

[1] The facts set forth in this section are derived from the parties' joint statement of undisputed material facts. They are taken in the light most favorable to Sweatt, the non-movant.

and repair railroad track. During his time at Union Pacific, Sweatt also worked as an assistant foreman, a trackwalker, a trackman, and a tie inserter. As an assistant foreman, he drove the section truck in addition to performing the job duties of a laborer. As a trackwalker and trackman, his job duties included tamping, assisting with welding, and pulling spikes with a claw bar to perform minor repairs on the railroad track. As a tie inserter, Sweatt pulled out and inserted railroad ties. All these jobs were heavy duty positions.

Sweatt developed pain in his shoulder and hands while working for Union Pacific. Although the pain developed over time, he recalled noticing the pain in his shoulder and hands around June 2009 when he was working at Union Pacific's Lake Street site. Around that time, the pain was so unbearable when he was using a claw bar that he had to ask other workers to help him with his tasks. Sweatt did not seek medical attention at the time, however, because he did not want to take time off work. According to Sweatt, both pneumatic and hydraulic tools caused him hand pain, and the gloves that Union Pacific issued him as part of his personal protective equipment did not dampen the vibration caused by these tools. He did not ask for any other heavy duty gloves. Sweatt admits that the tasks that caused his injuries were essential to the work he did as a trackworker and trackwalker.

On November 19, 2009, Sweatt saw Nurse Practitioner Ruth Valentin with complaints of bilateral hand pain that he had been experiencing for "quite a while now." Joint Stmt. of Facts ¶ 16. Valentin's notes reflect that Sweatt's job involved repetitive motion and that Sweatt may have carpal tunnel syndrome. Sweatt then saw Dr. Robert Coats on November 30, 2009. Dr. Coats' notes indicate that Sweatt reported that he first noticed the pain in his hands and shoulder around May 2009 and that the pain was worse when he was at work. Dr. Coats prohibited Sweatt from using vibratory tools, lifting over five pounds, and pulling over five pounds.

After seeing Dr. Coats, Sweatt filled out an injury report on December 11, 2009. His last day of active employment with Union Pacific was in December 2009. In March 2010, Dr. Coats performed right shoulder rotator repair cuff surgery on Sweatt. Dr. Coats saw Sweatt for a follow up appointment in February 2011, reiterating that Sweatt should pursue less demanding work. In the summer of 2012, Dr. Coats requested that Union Pacific approve bilateral carpal tunnel release surgery for Sweatt, but Union Pacific refused.

In January 2011, Union Pacific offered Sweatt the opportunity to participate in one of its two disability management programs, the Vocational Rehabilitation Program.[2] The Vocational Rehabilitation Program is designed for those employees unable to return to their regularly assigned positions due to injury or illness. Outside vocational rehabilitation counselors work with these employees to develop vocational plans as well as assist with interviewing skills, resume preparation, and training. The counselors work to place the employees in their pre-injury positions if possible, in another open position at Union Pacific, or even in a position outside Union Pacific.

Initially, Sweatt declined the services offered by the Vocational Rehabilitation Program but ultimately accepted them after speaking with Candace Girard, Union Pacific's Director of Disability Management, and Dr. Coats. He began working with vocational counselor Elizabeth Watson in February 2011. Sweatt tested well below average on the vocational tests he was administered. Sweatt provided Watson with his medical records, informing her that he had bilateral carpal tunnel syndrome, a right shoulder impingement that was surgically repaired, and a history of degenerative disc disease and cervical spine surgery. Watson determined that Sweatt

---

[2] Union Pacific's other program, the Return to Work Program, is a managed light-duty program for those employees with temporary work restrictions whose physicians have indicated that they will be able to perform the essential functions of their regularly assigned positions within sixty calendar days. The Return to Work Program is intended to help these employees transition back into their pre-injury positions.

needed to find a job that was less demanding than that of a trackworker. Watson and Sweatt discussed various job options based on Sweatt's medical limitations and his test results.

While working with Sweatt, Watson learned of an opening for a security officer with Union Pacific in the Chicago area, a position in which Sweatt expressed interest.[3] Sweatt was scheduled for an interview for this position in Omaha, Nebraska on March 16, 2011. To prepare, Watson provided Sweatt with a document that set forth information Sweatt would have to provide on a personal history form before his interview. This included a section on arrests, specifically requesting the "[n]ature of offense, name & location of court, disposition of case," as well as information about convictions, probation, and parole. Joint Ex. 14. When Sweatt arrived in Omaha on March 16, he filled out a Personal History Statement. Under the arrests heading, the form asked whether Sweatt had ever been convicted of a misdemeanor or felony, had ever been on probation or parole, and had ever been under indictment or charges for a criminal offense. He answered no to all three questions. Sweatt then interviewed with Bruce Finger, the Director of Training and Internal Placement, and Ken Eultgen, the Director of Homeland Security. Based on an interviewer's question form used for all security officer interviews, Finger asked Sweatt whether he had ever been arrested or convicted of a misdemeanor or felony. Sweatt responded that he had not. After the interview, Finger recommended Sweatt for the open position.

Finger's recommendation triggered a background investigation by Union Pacific's Northern Region. Each division conducts background investigations slightly differently, although all receive the same information from the main offices in Omaha, specifically the candidate's Personal History Statement, eVerifile criminal background report, PeopleSoft

---

[3] Security officers are placed almost exclusively through Union Pacific's disability management programs.

records, and the completed interview questioner's form. The Northern Region does not rely solely on the eVerifile criminal background report for applicants for its Police Department and instead also runs a LEADS/NCIC check. The LEADS/NCIC database is restricted to law enforcement and contains criminal arrest record information. Interviews are also conducted as part of the background investigation. Once the background investigation is completed, the agent in charge of the investigation completes a background investigation narrative. This narrative has no set form. Although a narrative may not state that a NCIC/LEADS check was run, that does not mean it was not run. After reviewing the background investigation narrative, Finger and the Regional Director make the ultimate decision of whether to offer a position to the candidate.

Sweatt's eVerifile report showed that he did not have any record convictions for misdemeanors or felonies over the previous seven years. The LEADS/NCIC check that Special Agent James Weller ran, however, indicated that Sweatt had been arrested in Flossmoor, Illinois on two counts of battery in 1997. Agent Weller then interviewed Sweatt, asking Sweatt if he had ever been arrested. Sweatt responded in the negative. Agent Weller repeated the question up to three or four times, with Sweatt's response consistently the same. Ultimately, Agent Weller asked Sweatt if he was ever arrested in Flossmoor, Illinois. Sweatt then responded "that was just a misunderstanding and the judge threw that out of court." Joint Stmt. of Facts ¶ 62. He further related that the arrest involved a domestic dispute and that he remained friends with the other party.

Agent Weller also interviewed Sweatt's former supervisor at Union Pacific, Richard Johnson. Johnson reported that Sweatt was a good employee, was on time to work, had good character, and did not abuse sick time. Johnson recommended Sweatt for the security officer position. One of Sweatt's former employers also told Agent Weller that she did not have any

5

problems with Sweatt over the fifteen years he worked for her and that the company never received any negative reports about Sweatt from any clients. She further stated that the company would rehire him if he applied for another position with them. This information, along with that surrounding Sweatt's arrest record and inconsistent responses during the interview with Agent Weller, was incorporated into a background investigation narrative sent to Northern Region Captain Jack Harris and Finger.

Upon receipt of the background investigation narrative on Sweatt, Captain Harris raised his concerns about Sweatt to Finger. Finger then asked Regional Director Mark Kalinowski for his opinion. Kalinowski indicated that he did not recommend Sweatt for the job based on Sweatt's untruthfulness about his prior arrest. Kalinowski and Finger then together decided not to hire Sweatt as a security officer because he was untruthful regarding his prior arrest. They both testified that if Sweatt had corrected the discrepancy regarding his prior arrest when asked during his interview with Agent Weller, he would not have been disqualified. On March 31, 2011, Sweatt received a letter stating that his "background investigation has disclosed information and circumstances that disqualify you as a candidate for Security Officer." Joint Ex. 23. This was a form letter sent to all disqualified candidates.

Although disqualified from the security officer position, Sweatt continued to work with Watson to find other employment at Union Pacific, expressing interest in working as a driver of a bus gang, a janitor for a depot, or as a clerk. There were no driver or janitor positions available, however, and Sweatt did not have the work experience or training to perform the clerk position. Sweatt checked for available positions at Union Pacific that fit his restrictions and did not find any. Watson did not search for positions for Sweatt outside of Union Pacific, as Sweatt indicated he wanted to return to work at Union Pacific. She also did not suggest that Union

6

Pacific provide him with any training that would qualify him for a job like a clerk position, although she did recommend that Sweatt take computer classes to obtain the skills required for sedentary positions.

In April 2011, Sweatt began work as a bus driver for Positive Connections Bus Company, having obtained his commercial driver's license ("CDL") earlier that year. Sweatt also began work as a janitor at the New Faith Church at some point in 2011. In May 2011, Sweatt informed Watson that he wanted to hold off on meeting with her further until he determined how his job as a bus driver was going. Watson continued to offer her services and look for jobs on Union Pacific's website for Sweatt. On December 5, 2011, after being unable to contact Sweatt, Watson recommended closing his file. Sweatt's counsel requested that it be kept open, however, and Union Pacific gave Watson permission to reopen the file. Watson last spoke to Sweatt on August 15, 2012, who informed her that he was still working and that she should speak with his counsel. Watson spoke to Sweatt's counsel the following day, who asked that Watson not speak to Sweatt until updated work restrictions were obtained. She then placed the case on hold, where it remains.

## II. Comparators

Since 2009, nineteen individuals have been offered a security officer position. The background investigation narratives for the following do not state whether a NCIC/LEADS inquiry was made: Employee B (a fifty-three year old Caucasian male in the Northern Region); Employee D (a forty-two year old Caucasian male in the Northern Region); Employee E (a twenty-two year old Caucasian male in the Southern Region); Employee G (a forty-nine year old Caucasian male in the Southern Region); Employee L (a forty-nine year old Caucasian male in the Western Region); Employee N (a fifty-three year old Caucasian male in the Northern

7

Region); Employee O (a sixty-one year old Caucasian male in the Northern Region); Employee P (a thirty-four year old Caucasian male in the Northern Region); Employee Q (a forty-one year old Hispanic male in the Western Region); and Employee R (a forty year old Hispanic male in the Western Region). The background investigation narrative for Employee F, a thirty-three year old Caucasian male in the Northern Region, does not indicate whether a NCIC/LEADS inquiry was made but does note with respect to criminal history that nothing was found that was not already reported or known by Union Pacific. Employee I, a forty-four year old African-American male in the Northern Region, was interviewed by Agent Weller, who noted in the background investigation narrative that Employee I did not have a criminal record and had never been arrested.

Several hires revealed arrests in their interviews. Employee A is a sixty-four year old Caucasian male hired in the Southern Region. His background investigation narrative indicates that he volunteered during his interview that he had been arrested for misdemeanor theft. Employee C, a fifty-six year old Caucasian male in the Western Region, was asked if he had ever been in trouble with the law during his interview. He responded that his ex-wife filed domestic violence charges against him, which were later dropped. His narrative does not indicate whether a NCIC/LEADS inquiry was made. Employee J is a twenty-five year old Caucasian male in the Northern Region whose background investigation was performed by Harris. A NCIC check was run on Employee J. Employee J indicated in his Personal History Statement that he did not have any traffic citations but, when asked during the interview, he volunteered that he had received a seat belt citation and paid a small fine to resolve it. Employee K is a fifty-eight year old Caucasian male in the Southern Region who indicated on his Personal History Statement that he had never been convicted. A NCIC check, however, revealed that he had been arrested and

8

convicted for driving under the influence and writing a worthless check. When asked during his interview if he had been convicted, Employee K admitted to both convictions and indicated that he had been confused by the application.

Employee S, a forty-six year old Hispanic male in the Southern Region, was hired despite various inconsistencies discovered during his background investigation. These included listing family members as references despite the form stating references could not be family members, failing to provide a list of addresses for the past ten years, and having been disciplined for a rules violation by Union Pacific despite answering that he had never been disciplined, discharged, terminated, fired, or forced to resign because of a rules violation or other misconduct. The agent conducting the investigation recommended against hiring Employee S for the security officer position. But Finger overrode the agent's recommendation and offered Employee S the security officer position, deeming the discrepancies trivial.

Two hires do not have a background investigation narrative on file. Employee H, a forty-two year old Caucasian male in the Northern Region, was a Union Pacific employee wounded in Afghanistan who did not come through Union Pacific's disability management program. A background investigation was not conducted but his discharge status was reviewed. Employee M, a fifty-two year old Caucasian male in the Western Region, did not undergo a background investigation to become a security officer because he was already a special agent and so a background investigation had been conducted at that time.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and

9

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I. FELA Claim (Count I)

Union Pacific argues that Sweatt's FELA claim is barred by the statute of limitations. FELA has a three-year statute of limitations. 45 U.S.C. § 56. A FELA claim accrues "when a reasonable person knows of or in the exercise of reasonable diligence should have known of both the injury and its governing cause." *Fries v. Chi. & Nw. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990). When the specific date of injury cannot be determined because the injury involves a progressive condition, the claim accrues when the injury manifests itself. *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 865 (7th Cir. 1996). The plaintiff need not be aware that a legal wrong has occurred; what is important is knowledge of the injury and its cause. *Id.* Moreover, once a plaintiff knows or has reason to know of a potential cause of the injury, the plaintiff has an affirmative duty to investigate its cause. *Id.*

Sweatt complains of two injuries, to his hands and his shoulder. Union Pacific argues that Sweatt's claims arising out of these injuries accrued in June 2009, over three years before Sweatt filed his complaint on November 30, 2012. With respect to his shoulder pain, Sweatt testified that, around June 2009, he came to believe that his shoulder pain was being caused by using claw bars at work, that the pain was unbearable, and that he had to ask his coworkers for help in completing his tasks. He claims he decided not to seek medical attention at that time because he did not want to take time off work. Union Pacific contends that this is sufficient to demonstrate that Sweatt's claim regarding shoulder pain accrued at that time. Sweatt, on the other hand, argues that his shoulder pain was merely intermittent in June 2009 and that a factual issue exists as to whether that pain was serious enough to put him on notice that he should act on it or potentially lose his right to sue. *See Green v. CSX Transp., Inc.*, 414 F.3d 758, 764 (7th Cir. 2005). Sweatt essentially argues that it was not until he saw Dr. Coats on November 30, 2009, who diagnosed him with right shoulder impingement syndrome, that he became aware of the seriousness of his injury. But Sweatt cannot delay the accrual of his claim because he waited to investigate the cause of the pain and obtain an official diagnosis. *See Fries*, 909 F.2d at 1095–96. Nor is Sweatt's argument that he was not required to investigate the cause of the pain beginning in June 2009 plausible given the undisputed facts here. Unlike in *Green*, where the Seventh Circuit concluded that the plaintiff only suffered from "intermittent pain," 414 F.3d at 764, Sweatt testified that the pain in his shoulder in June 2009 was unbearable and required him to obtain help from his coworkers. He specifically tied the pain in his shoulder to use of the claw bars, with there being no suggestion of an alternative cause. Although he did not miss work, Sweatt testified that this was not because he did not think medical attention was unnecessary but rather because he did not want to take time off from work. Because the undisputed facts

demonstrate that Sweatt knew about his injury before November 30, 2009 and should have investigated that injury before then, his FELA claim related to shoulder pain is time-barred.

As for his hand pain, there is no question that this claim accrued prior to November 30, 2009. Sweatt testified that he began suffering significant pain in his hands while working in June 2009. Even assuming, however, that such pain could be attributed to muscle soreness too trivial to impose a duty to affirmatively investigate the cause of the injury, the record reflects that Sweatt saw a nurse practitioner on November 19, 2009 complaining specifically of bilateral hand pain. Nurse Practitioner Valentin's notes indicate that she concluded that Sweatt may have carpal tunnel syndrome and that his pain was tied to the repetitive motion he did at work. This doctor's visit, at the latest, was sufficient to put Sweatt on notice of his injury and its potential cause. And as this visit falls outside the limitations period, his FELA claims related to his hand pain are time-barred as well.

## II.   Age and Race Discrimination (Counts II and III)

A plaintiff claiming age or race discrimination can prove his case under the direct or indirect method of proof. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014) (age discrimination); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 & n.4 (7th Cir. 2009) (race discrimination). Sweatt has not set forth any admissible direct evidence of discrimination, and thus the Court will proceed to analyze his claims under the familiar indirect method of proof set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this approach, Sweatt must show that (1) he is a member of a protected class, (2) he sought a position for which he was qualified, (3) he was not hired for that position, and (4) that a similarly situated person outside his protected class was hired for the position instead. *Gore v. Ind. Univ.*, 416 F.3d 590, 592 (7th Cir. 2005). For purposes of his age discrimination

claim, the fourth element is modified to require a showing that a substantially younger person who was similarly situated was hired, regardless of whether that person is under the age of forty (*i.e.* outside of the protected class). *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003); *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 892–93 (7th Cir. 1997) (ten-year age difference with comparator is presumed substantial, regardless of whether the comparator also falls within the protected class). If Sweatt establishes his *prima facie* case, Union Pacific must present evidence showing a legitimate, nondiscriminatory reason for its decision not to hire Sweatt for the position. *Zaccagnini*, 338 F.3d at 675. Sweatt must then present evidence showing that Union Pacific's stated reason is pretextual. *Id.*

Sweatt's complaint suggests that his discrimination claims are based on Union Pacific's failure to hire him not only for the security officer position but also for open jobs that required a CDL. The undisputed evidence before the Court demonstrates that Sweatt only ever applied for the security officer position and that there were no open jobs requiring a CDL during the time Sweatt was searching for a job, however. *See id.* (to establish *prima facie* case for failure to hire, plaintiff must show that he applied for an open position). Sweatt also does not develop any argument with respect to CDL positions or Union Pacific's failure to rehire him into any other position, and therefore that claim is abandoned. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (claim deemed abandoned where plaintiff failed to discuss claim in brief in opposition to summary judgment). Thus, to the extent Sweatt's age and race discrimination claims encompass anything but the security officer position, summary judgment is granted in favor of Union Pacific.

As for Sweatt's claims of discrimination with respect to the failure to hire him for the security officer position, Union Pacific argues that Sweatt cannot establish the fourth element of

his *prima facie* case and that he cannot establish that the reason Union Pacific gave for not hiring him was pretext for age or race discrimination. The Court need not address whether Sweatt has established a *prima facie* case, for even if he has, he has not presented evidence from which a reasonable jury could find that Union Pacific's reason for not hiring him was pretext for age or race discrimination. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012) ("Although the question of pretext normally arises only after the plaintiff has established a *prima facie* case of discrimination and the employer has countered with a legitimate non-discriminatory reason for the adverse action, we may skip over the initial burden-shifting of the indirect method and focus on the question of pretext.").

To establish pretext, Sweatt must demonstrate that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (brackets omitted) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). The Court looks to the honesty of the employer's explanation, not its validity or reasonableness. *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013); *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Union Pacific maintains that Sweatt was not hired as a security officer because he was untruthful with respect to his prior arrest during the background investigation. Sweatt appears to argue that this reason is a lie based on two things: (1) the statement in the letter notifying Sweatt

14

that he was not being hired for the security officer position that the background investigation disclosed information and circumstances that disqualified Sweatt from being a security officer, and (2) Union Pacific's admission in its answer to the complaint that Sweatt was disqualified because he did not pass the background check.[4] Sweatt has agreed that the text in the letter he received is stock language that does not amount to an explanation of the reason for his disqualification. Moreover, Sweatt has not identified an inconsistent explanation, as the background investigation is a broad term that encompasses Sweatt's truthfulness during that investigation. *See O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997).

Sweatt is thus left only to argue that the explanation given is unworthy of credence because Union Pacific tolerated other claims of confusion but not his and that his untruthfulness should not have disqualified him in the face of positive reports from former supervisors and employers. Although Sweatt may believe that Union Pacific's policies were applied unevenly to him and that his actions did not warrant disqualification, the Court does not sit as a "super personnel department that second-guesses employer's business judgments." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted). Because this is not sufficient to call into question Union Pacific's proffered reason for not hiring Sweatt for the security officer position, the Court grants summary judgment for Union Pacific on Sweatt's age and race discrimination claims.

### III. ADA Claims (Counts IV and V)

In his complaint, Sweatt alleged that Union Pacific discriminated against him based on a perceived or actual disability and failed to provide him with reasonable accommodations. Union Pacific argued that it is entitled to summary judgment on these claims because Sweatt cannot

---

[4] To the extent Sweatt argues that Union Pacific violated Illinois law by inquiring whether he was ever arrested, that claim is not before the Court nor is it relevant to determining whether Union Pacific's reason for disqualifying Sweatt is pretextual.

establish a *prima facie* case of disability discrimination or failure to accommodate under the ADA. Sweatt did not respond to Union Pacific's arguments on the ADA claims in his response to the motion for summary judgment. At the summary judgment stage, the non-moving party must present facts showing a genuine issue for trial. *Insolia*, 216 F.3d at 598. By failing to respond to Union Pacific's arguments regarding his ADA claims, Sweatt is deemed to have abandoned those claims. *See Palmer*, 327 F.3d at 597; *Titus v. Ill. Dep't of Transp.*, No. 11 C 944, 2014 WL 625700, at *3 (N.D. Ill. Feb. 18, 2014) ("The Seventh Circuit has 'long refused to consider arguments that were not presented to the district court in response to summary judgment motions.'" (quoting *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999))). Accordingly, summary judgment is granted for Union Pacific on Sweatt's ADA claims.

## CONCLUSION

For the foregoing reasons, Union Pacific's motion for summary judgment [47] is granted. Judgment is entered for Union Pacific on all claims. This case is terminated.

Dated: June 3, 2014

SARA L. ELLIS
United States District Judge